(No 5699. March 18, 1931.)

LOUIS P. KIELDSEN, Plaintiff, v. GEORGE G. BARRETT, as State Treasurer, Defendant.

[297 Pac. 405.]

Richards & Haga, for Plaintiff.

Fred J. Babcock, Attorney General, and Maurice H. Greene and S. E. Blaine, Assistant Attorneys General, for Defendant.

LEE, C. J.—Petitioner, Louis P. Kieldsen, seeks a writ of mandate commanding the State Treasurer to transfer from the Farm Mortgage Fund to the Public School Endowment Fund certain moneys alleged to have been wrongfully placed in the Farm Mortgage Fund and all other moneys coming into the possession of the defendant from the sale or rental of lands granted to the state of Idaho by the United States for the support of the common schools and from the sale or rental of lands acquired by the state under foreclosure of mortgages taken as security for moneys loaned out of the Public School Endowment Fund.

Inasmuch as petitioner urges no instance where any proceeds of direct sales of school lands have been placed in the Farm Mortgage Fund, this proceeding has to do with proceeds arising from the sale or rental of lands acquired by the state upon foreclosure.

A typical instance of alleged unlawful procedure is that of Loan No. 1486 made from the Public School Endowment Fund October 27, 1915, to Sam E. Ross, amount of loan, $4,000. The land was sold under foreclosure April 16, 1927: later the state received the sheriff's deed. Not including interest, the loan had cost the state, in addition to the original $4,000, $58 for abstract, $20 for publication of

notice of sale, and $3,793.08 for delinquent taxes, penalties and interest, a total of $7,871.08. The land sold for $6,750. Under the statute, none of this money was to be placed in the school fund until there should have been repaid to the Farm Mortgage Fund the sum it had theretofore advanced the state to pay back taxes and expenses of foreclosure.

A clear conception of the situation requires a study of the constitutional provisions and legislative enactments germane to the subject matter. Sec. 3, art. IX, Idaho Const., provides:

"The public school fund of the state shall forever remain inviolate and intact; the interest thereon only shall be expended in the maintenance of the schools of the state, and shall be distributed among the several counties and school districts of the state in such a manner as may be prescribed by law. No part of this fund, principal or interest, shall ever be transferred to any other fund, or used or appropriated except as herein provided. The state treasurer shall be the custodian of this fund, and the same shall be securely and profitably invested as may be by law directed. The state shall supply all losses thereof that may in any manner occur."

By the act of March 9, 1923, there was created in the office of the State Treasurer a revolving fund to be known as the Farm Mortgage Fund consisting of $25,000 appropriated for the purpose of paying delinquent taxes, water assessments and expenses of mortgage foreclosures on lands securing farm loans held by the state: the act provides:

"Sec. 3. From and after the passage and approval of this act all moneys collected by the state either in mortgage foreclosure suits or by the redemption by mortgagees or their assigns, or from the sale of lands taken by the state on foreclosures and afterwards sold by the state, to the extent of said moneys advanced by the state to pay delinquent taxes, water assessments, and expenses incident to the foreclosure of mortgages on lands and premises on which the state holds or has held mortgages, shall be placed in the

'farm mortgage fund' by the state treasurer where such moneys be collected in installments, all such collections as made shall be placed in the 'farm mortgage fund' until the sum or sums advanced by the state shall have been so received and apportioned; *Provided,* That whenever such repayments of moneys advanced by the state shall cause the balance in the 'farm mortgage fund' to exceed twenty-five thousand dollars, such excess shall be placed in the general fund of the state treasury by the state treasurer.''

Subsequent legislatures made additional appropriations and enlarged the act to include rentals of lands acquired by the state in handling its farm loans, the last act being that of March 9, 1929, which provides:

''From and after the passage and approval of this act all moneys collected by the State either in mortgage foreclosure suits or by the redemption by any redemptioner, or from the sale of lands taken by the State on foreclosures and afterwards sold by the State, and all rentals realized by the State from said land either during the period of redemption or thereafter, to the extent of said moneys advanced by the State to pay delinquent taxes, water assessments, fire insurance premiums, and expenses incident to the foreclosure of mortgages on land and premises on which the State holds or has held mortgages, shall be placed in the farm mortgage fund by the State Treasurer, and where such moneys shall be collected in instalments, all such collections as made shall be placed in the farm mortgage fund, until the sum or sums advanced by the State shall have been so received and apportioned.''

Counsel for petitioner's main contention is that the act establishing this revolving fund is unconstitutional, for the reason that repayment of the moneys advanced by the fund for the liquidation of delinquent taxes does, in the event that the proceeds of a foreclosure are insufficient to realize both the original investment and the taxes paid, necessarily deplete the sum which would otherwise return to the Public School Endowment Fund.

When the state makes a mortgage loan, it can expect to realize its full investment in only one of two ways, payment or foreclosure. In the latter case, there will always be danger of loss, unless the original value of the security upon which the loan was made is maintained. That value cannot be maintained, if the security becomes burdened with liens and charges anterior to or coincident with the mortgage lien. No bidder will offer as high a price for lands plastered with liens as he will for land free of their burden; and the state accordingly suffers, for it has to take just whatever amount the bidder cares to offer over and above the attached tax liens.

True, the state is compelled to draw upon the proceeds of sale for the money to repay the sum advanced by the revolving fund, but it does not draw one penny springing from the original loan: the proceeds of the sale have been increased by the enhanced value of the security, made possible by the advancement. In other words, the sum advanced by the fund gave the state an appreciably greater security than it had before the advancement. The land brought not only what it would have brought, had the tax burden remained, but it brought in addition the actual amount of taxes paid and probably more, something that had never been in the endowment fund. The enhancement arose the moment the taxes were paid.

It is just as though the state had to foreclose upon a farm whereon was a set of weather-beaten, unpainted buildings. By painting the buildings, value would be enhanced and a better bid realized. Now, if the state paid from the school fund the expense of painting, it would be ·depleting the original fund. But, if Merchant Jones furnished the paint; and out of the increased sale proceeds, the state repaid him, it could not be said to have depleted its school fund, for it had expended nothing: it but passed on to Merchant Jones the proceeds of a value he alone had created.

It makes no difference whether the land goes to the highest bidder or is taken in by the state. In either instance, the

state loses nothing by paying back the advancement. How can it lose what it never had? In fact, having got a tax deed with the delinquent taxes wiped out, the state may have actually made money, not out of its own investment, but at the expense of the revolving fund, for it can sell the land free of taxes and thereby recoup for itself the very advancement it repaid the fund, besides getting all that would naturally have come to it and possibly more.

It may be said that in case the state bids in the property and secures a sheriff's deed, no necessity for paying the taxes arises, since they are effectually disposed of by the state's immunity from taxation. That immunity, however, does not operate until the deed has issued. At the time of filing its action, the state cannot foresee the outcome of the foreclosure. Whether the land will be sold to a third party, whether the state will be forced to bid it in or whether, later, there will be a redemption are matters wholly beyond its knowledge. Assuredly, the purpose of the state is to dispose of the land at the highest possible price, not to retain it. To achieve that end, was the revolving fund created, to protect a security menaced by delinquent and constantly accruing taxes; and, as before stated, that protection is furnished in the form of enhancement of a value steadily deteriorating under the burden of mounting tax liens.

What sums may be advanced for the incidental costs of foreclosure, while not enhancing any value, are imperatively necessary to reduce the land to either money or the state's possession. Without such expenditure, the state stands to lose the total amount of the original loan. In such case, it has forcefully been suggested that resort to the school fund itself, might be impliedly authorized, if not mandatorily directed as a duty by the Constitution which requires the school fund to be "securely and profitably invested." (*Board of Commrs., etc., v. State,* 125 Okl. 287, 53 A. L. R. 1128, 57 Pac. 778, 781.) If the investment prove insecure or unprofitable, it must be got rid of with as much dispatch

and as little loss as possible: continuing loss must be prevented.

The same answer will apply to the state's reimbursing the fund by means of rentals, etc. It has already received from the revolving fund advances equal to all it is required to return and is just handing back to the true owner that which for a time it has been permitted to use for its own accommodation or profit. The depletion petitioner complains of is due to no operation of the revolving fund but solely to unwise loans in the first instance or depreciation of land values later on, something to be remedied by the legislature, not by resort to the revolving fund.

General taxes are levied for governmental purposes: the state's farm loans are made for governmental purposes. (*Board of Commrs. v. State, supra.*) Tax liens on real property cannot be made subordinate to other liens without disregarding sec. 7, art. VII, of Idaho Const. That section reads:

"All taxes levied for state purposes shall be paid into the state treasury, and no county, city, town, or other municipal corporation, the inhabitants thereof, nor the property therein, shall be released or discharged from their or its proportionate share of taxes to be levied for state purposes."

Recognizing this provision, C. S., sec. 3097, declares that tax liens "shall only be discharged by the payment, cancelation or rebate of the taxes" as by law provided. All liens for governmental purposes are coequal in dignity: as between them, there is no priority. (*Board of Commrs. v. State, supra.*)

While the state, under the exemption statute, cannot be forced to pay delinquent taxes on lands acquired under mortgage foreclosure, the fact remains that, unless such taxes are paid, there may eventually be no state to function. Especially is this emphasized in the Oklahoma case just quoted, approving *Hughes County v. Hendy,* 48 S. D. 98, 202 N. W. 286, saying:

"We think the duty of the board to pay taxes, permission being given, may safely rest upon the broad ground of the

right of self preservation of the state and of its governmental subdivisions.''

Here in Idaho, there is not only legislative permission but direct mandate where there arises the necessity of protecting the loan.

The legislature's neglect to comply with the constitutional requirement that it make good all losses suffered by the Public School Endowment Fund accounts in the last analysis for any degree to which the fund is not intact. Of the constitutionality of the enactments, we have no doubt.

Petition denied.

Givens and Varian, JJ., concur.

Petition for rehearing denied.

McNAUGHTON, J., Dissenting.—I am unable to concur entirely with the conclusions reached by the chief justice. I think the controlling purpose of this case is to determine the constitutionality of the Farm Mortgage Revolving Fund acts in their application to the foreclosure of the common school fund mortgages. These acts authorize, but do not require, the commissioner of finance to pay all taxes assessed against lands upon which school fund mortgages are a lien before foreclosure. These payments are to be made out of the Farm Mortgage Revolving Fund. The acts require that after foreclosure upon sale of such lands the proceeds of such sale shall be paid into the farm mortgage revolving fund, and it shall retain the sums advanced by that fund for payment of the taxes and other foreclosure expenses, and pay the residue, if any, into the common school fund.

So far as the acts authorize the payment of these taxes and charge such payments against the lands, I think they are unconstitutional. I differ mainly from the chief justice in that I do not think it necessary to pay such taxes in order to protect the mortgage as a first lien. As I understand the opinion it holds the tax lien is not prior to the mortgage lien, but that the liens are on a parity; that a

foreclosure sale to a third party would be subject to the tax lien and *vice versa;* a tax sale to a third party would be subject to the mortgage. But in case the property is not sold in the foreclosure proceedings, and a sheriff's deed issues to the state, then it is held by the state for the common school fund free of all tax liens.

Sec. 3, art. 9, provides in part:

"The public school fund of the state shall forever remain inviolate and intact. . . . . No part of this fund, principal or interest shall ever be transferred to any other fund, or used or appropriated except as herein provided. . . . . The state shall supply all losses thereof that may in any manner occur."

I think the purpose of this provision is to protect the public school fund against every other fund of the state. Its purpose is to provide that not a dollar of the capital assets of the school fund shall be subjected to or used for any governmental purpose, state or local. That is, the principal or capital assets of the fund shall forever remain intact.

It seems to me the facts of the sample case which is discussed in the opinion are quite conclusive that the farm mortgage fund acts may operate in direct violation of this section of the Constitution and did so operate in this case. In authorizing the payment of tax liens and charging such payments against the land, the tax lien was preferred by payment in full, but the principal of the mortgage was only half paid.

In this case the owner of these lands had not only failed to pay the principal and interest of the school fund mortgage to the state, but he had failed to pay taxes assessed against him by Owyhee county. The items of tax indebtedness against him with penalties which were also a lien against the lands were nearly as great as the mortgage. In this case the principal of the school fund mortgage is $4,000. The tax claimed by Owyhee county $3,793.08. The land after foreclosure sold for $6,750. This is $2,750 more than

the principal of the mortgage. The situation however, presented this dilemma—there must be a loss either to the tax lien or the principal of the mortgage lien. Both liens are in behalf of the state. The state in holding each of these liens is acting in its sovereign capacity. One lien is in behalf of the school fund, the principal of which the Constitution protects inviolate, the other lien is in behalf of general revenue funds. The acts in question authorize the payment of the tax lien but require that after the mortgage is foreclosed the proceeds upon sale of the lands shall be paid into the farm mortgage fund. It then provides that this fund shall retain the sums advanced in payment of the taxes and other expenses, and pay what remains, if anything, into the school fund. By this plan the general revenue funds, state and local, are absolutely protected *in toto*. This protection, it seems to me, to the extent of any loss, is directly and wholly at the expense of the capital assets of the common school fund. I think the plain import of the constitutional provision is to protect the common school fund in preference to all other funds of the state. This legislation, it seems to me, has the opposite effect. In the sample case presented it seems to have protected the general revenue funds of the state at the expense of the common school fund.

While C. S., sec. 3097, subordinates all private interests in or liens on real estate to the liens of taxes for general revenue purposes, I do not think its provisions extend to an interest or lienhold by the state in its sovereign capacity. I think if it was meant thereby to subject the lien of public school fund mortgages prior in time it would to that extent be in contravention of sec. 3, art. 9, of the Constitution.

No doubt the right of self-preservation gives the state broad powers in enacting revenue laws necessary in carrying out the governmental functions of the state and its subdivisions. Still, in Idaho the Constitution was adopted before statehood. Statehood was conferred and the school land grants were made by the Congress in the faith of these con-

stitutional provisions. Even if the state could not otherwise raise current expenses I am not sure it could draw upon the public school fund. Nor do I think the capital assets of the common school fund can under our Constitution be taken by taxation or otherwise for general governmental purposes any more than the cash assets of the fund.

No doubt the intent of the legislature in creating the Farm Mortgage Revolving Fund and in directing its application in the manner set forth in the acts was to protect the common school fund mortgages from tax liens which were thought by the legislature to be prior liens. It was not the purpose to make the tax liens prior. It was thought they were prior, and the acts if followed carry out that thought and result in giving the tax lien priority. Therein I think they are unconstitutional.

I think the use of the Farm Mortgage Revolving Fund in paying these tax liens and charging such payments against the lands as necessary expenses in foreclosure should be prohibited. If the legislature wishes to authorize the payment of these tax losses out of the general fund as recommended by the Constitution, that is another matter. I don't think they can lawfully be paid out of the property assets of the school fund.

I am not convinced this court should direct by *mandamus* the sale receipts if the land in question be not paid to and held by the farm mortgage fund until that fund is reimbursed the tax outlay. While the taxes were not a prior lien over the mortgage, and the payment may have been unnecessary, nevertheless they were paid voluntarily, and taxes thus paid cannot be recovered. (*Asp v. Canyon County*, 43 Ida. 560, 256 Pac. 92.) This is so because the tax money is disbursed to many funds and to attempt recovery and re-adjustment would throw out of balance and disrupt the whole taxing machinery. Adjustment and recovery being impossible we cannot direct the loss fall upon the revolving fund. We cannot by *mandamus* authorize a use of funds provided by the legislature in a manner

different from that for which they were appropriated. We cannot use or authorize the use of the fund for paying taxes. The money was appropriated as an advancement, not as tax money or otherwise at all.