ALAMO DRAINAGE DISTRICT, a Wyoming Drainage District, Plaintiff in Error,

v.

THE BOARD OF THE COUNTY COMMISSIONERS OF THE COUNTY OF BIG HORN, WYOMING, Defendant in Error.

(No. 2277; Apr. 18, 1944; 148 P. 2d 229)

178

For the Plaintiff in Error there was a brief and an oral argument by L. A. Bowman, of Lovell, Wyoming.

For the Defendant in Error there was a brief and an oral argument by C. A. Zaring, of Basin, Wyoming.

## OPINION

BLUME, Justice.

This is an action brought by the Board of County Commissioners of the County of Big Horn, as plaintiff, against the Alamo Drainage District et al., defendants, to foreclose a general tax lien on lands located in Big Horn County. The State which holds bonds of the Drainage District was not made a party. The properties involved in this appeal are the East Half (E½) of the Southeast Quarter (SE¼) of Section Twenty-Two (22), and the Northeast Quarter (NE¼) of the Northeast Quarter (NE¼) of Section Twenty-Seven (27), both in Township Fifty (50) North, Range Ninety-Three (93), Sixth (6th) Principal Meridian. The question involved herein is as to whether or not the lien for general taxes is superior to the lien of the State which it has by reason of an investment in bonds issued by the Alamo Drainage District. The Court held that the lien for the general taxes is paramount and superior and from this holding the Alamo Drainage District has brought the case here by petition in error. The plaintiff below will be referred to as the "County," and the Alamo Drainage District as the "Drainage District."

The action was brought under the provision of Chapter 84, S. L. of 1935. The first section of that Act, as amended by Chapter 84 of S. L. of 1937, is as follows:

"Any person, county, city or sub-division thereof holding a tax sale certificate of purchase or tax deed heretofore or hereafter isued for delinquent taxes legally levied and assessed, together with the penalty and costs due on the land described therein shall have a lien on said land for such taxes, penalty and costs, and all subsequent taxes paid thereon by said person, county, city or sub-division thereof and those under whom he holds, with interest thereon, and all accru-

ing penalties, and for the value of all improvements placed thereon by such lien holder while lawfully in possession of the premises, and those under whom the same is held, which lien shall be superior to any other lien, except that of junior tax sales or subsequent taxes, and may be enforced by such lien-holder by a civil action in the District Court of the County wherein said land lies, or in any action in such court concerning said land in which such lien-holder may be made a defendant; in which action every person having an interest in said land, as shown by the records in the office of the County Clerk and Ex-Officio Register of Deeds of said county, shall be made a party; and all the proceedings in such action, so far as applicable and not inconsistent with the provisions of this Act, shall be the same as provided by law, for the foreclosure of mortgages on real estate by action and sales thereunder; provided that the decree rendered in such action may contain the order of sale, directed to the sherif of said county, commanding him to advertise and sell said lands without appraisement, and to make a return of his proceedings thereunder within sixty (60) days from the date thereof, which shall be sufficient authority for the sale of said land, and no other order of sale shall be necessary; and provided further, that any number of tracts of land belonging to any one person upon which any one lien-holder shall have said lien, may be united in one suit, in which suit each of said tracts of land shall bear its proportionate share of the cost of such suit, calculated upon the amount for which it shall sell. Provided further, that no action shall be commenced on any tax sale certificate within four years from the date of the sale mentioned herein, nor shall any such action be commenced after ten years from the date of such sale."

Section 3 of the Act provides for a sale of the premises by the sheriff and states, among other things, that "upon confirmation of said sale by the Court, the said Sheriff shall execute a deed as nearly as may be in cases of mortgage foreclosure, conveying to the purchaser of said property, his heirs and assigns,

all the right, title, estate, claim and interest, both at law and in equity, of all parties to said action in and to said land, subject only to the rights of Junior Tax Sales or taxes." Section 4 of the Act provides that the money realized from the sale shall be applied, first, to the payment of costs of the action, including an attorney fee; second, to the payment of all sums due the lien-holder, evidently referring to the lien-holder bringing the action in the case; third, the balance to the owner of the land and those having an interest therein as their interests may appear. Section 6 of the Act provides that, "The word 'person,' as used in this Act, shall be construed to mean any person, corporation or co-partnership, or any association owning land."

The case was tried upon a stipulation of facts. It appears therefrom that the E½ of the SE¼ of Section 22, above mentioned, was duly assessed for taxation. On August 31, 1934, the County Treasurer of Big Horn County sold the land at a tax sale and issued the certificate to Big Horn County, the purchaser at the sale. The taxes delinquent, commencing with 1931 to 1940, inclusive, amount to $507.21, which includes the interest on the delinquent taxes. The NE¼ of the NE¼ of Section 27, above mentioned, also assessed for taxation, was duly sold at a tax sale by the County Treasurer of Big Horn County, and the County of Big Horn became the purchaser thereof. The delinquent taxes against this land, commencing with 1932 and ending in 1940, amount, with interest, to the sum of $566.44. The Alamo Drainage District is a drainage corporation duly organized under the laws of this State. It installed a drainage system and incurred an indebtedness and obligations thereon. On or about the first day of July, 1924, it issued its drainage bonds in the sum of $190,000.00 and sold the same to

the State of Wyoming. The State purchased the bonds, using in the purchase thereof the permanent school funds of the State, and the major portions of the drainage bonds are still owned and held by the State and are unpaid. The lands above described are located within the boundary of the Alamo Drainage District. The E½ of the SE¼, above mentioned, was assessed for benefits in the sum of $6,129.03; the NE¼ of the NE¼ of Section 27, above mentioned, was duly assessed for benefits in the amount of $4,051.29. The taxes above mentioned were levied and assessed subsequent to the confirmation of the assessment for benefits levied, fixed and assessed against the property mentioned, and subsequent to the date when the State of Wyoming purchased bonds of the Alamo Drainage District and invested the permanent school funds of the State of Wyoming therein. At the time the bonds were purchased by the State of Wyoming, the Alamo Drainage District was in default in the payment of its original bond issue, and the bonds so purchased were issued as refunding bonds for the purpose of paying off the defaulted bonds of the district at par and with interest, and the bonds were purchased by the State with the knowledge of said default. The bonds were negotiable in form, and the bonds now owned by the State of Wyoming, too, are negotiable in form. The present value of the lands is less than the total of all past due and unpaid State and County taxes and the drainage assessments against the same. Although certificates of purchase have been issued for drainage taxes on the above lands no drainage deed has been issued.

I.  Counsel for the County argues that the Drainage District cannot raise the question of the constitutionality of the Legislative Act of 1935,—that is to say, the question of the relative superiority of the liens

for the reason that it has failed to show that it would in any manner be injuriously affected, and, further, that these questions cannot be raised by the State for the reason that it is not a party herein. We are unable to see why the District would not be injuriously affected if its lien is declared to be inferior to that of general taxes. It owes the indebtedness on its bonds and it has the right and we think it is its duty to protect the liens which are the sources of the payment of its bonds. To hold otherwise would be to hold that it has the right to defraud its creditors. The State must rely for the protection of its bonds upon the rights of the Drainage District and there can scarcely be any doubt that if the lien of the Drainage District is held to be inferior to that of general taxes its rights, so far as these bonds are concerned, are weakened and adversely affected. It is said in 59 C. J. 313, that a suit involving property in which the State has an undoubted right or interest, and in which no effective decree can be rendered without binding the State itself, is a suit against the State and cannot be maintained without its consent. In 59 C. J. 325, it is said that in all cases in which a State is so interested in the subject matter of a suit that its rights must of necessity be directly and adversely affected by the judgment or decree which it is sought to have rendered, the State is a necessary party defendant and if it cannot be made a party because it has not consented to be sued, the suit must be dismissed. Since the interests of the State would be adversely affected if the judgment herein should be upheld, we must either hold that the suit should be dismissed against the Drainage District or proceed to determine the relative superiority of the liens. We held in Board of County Commissioners v. Bench Canal Drainage District, 56 Wyo. 260, 108 P. 2d 590, that the Drainage District

represents the bondholders. In Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419, 422, it was held that a county, in handling school funds, acts for the State and to that extent has the rights of sovereignty. See also Lancaster v. Gray County (Tex. Civ. App.), 127 S. W. 2d 385, 388. A drainage district may sue, and may be sued, under the express provision of Section 122-835, Rev. St. 1931. There is no reason to hold that this is not true when as in this case it represents the State. We think, accordingly, that we should proceed to determine the main question herein. To decline to do so would evidently profit neither the State nor the County.

II. Counsel for the Drainage District argues that if the lien of the State were declared to be inferior to the lien of general taxes such declaration would be violative of Section 40 of Article III of the Constitution, reading as follows:

"No obligation or liability of any person, association or corporation, held or owned by the state, or any municipal corporation therein, shall ever be exchanged, transferred, remitted, released or postponed, or in any way diminished by the legislature; nor shall such liability or obligation be extinguished, except by the payment thereof into the proper treasury."

Assuming, without deciding, that the provisions would ordinarily be applicable, it is quite apparent that appeal to it may be made as effectively on behalf of the general taxes. In fact, such appeal was made to it in that connection in the Bench Canal Drainage District case, supra. We hardly think, accordingly, that under the circumstances the foregoing provision can be held to have any controlling effect herein.

III. Counsel for the Drainage District contends that if the Legislative Act of 1935 were construed to mean that it makes the lien of the State inferior to the

general taxes, it would be in violation of Section 35 of Article I of the Constitution which prohibits the impairment of contracts. Counsel for both parties herein agree that the laws and constitutional provisions of the State as they existed at the time when the State purchased the bonds of the Drainage District entered into and became a part of the contract in connection with the purchase of the bonds. Attention is called to the provisions of Section 122-886, Rev. St. 1931, which provides, among other things, that the assessments under the drainage laws shall "constitute a perpetual lien in amount not in excess of the benefits severally assessed, upon all the land and other property against which such assessments shall be levied, as provided herein, to which only the lien of the state for general state, county, city, town or school taxes, shall be paramount, and no sale of such property to enforce any general state, county, municipal, or school tax, or other lien shall extinguish the lien of such assessments." We agree with counsel for the County that this provision does not make the bonds or the liens of the Drainage District superior to the lien of general taxes. We so held in the Bench Canal Drainage District case, supra. An interesting discussion of the meaning of the clause, similar to the last clause above quoted, is contained in the recent case of Downing v. City of Russellville (Ala.) 3 So. 2d 34, on rehearing. The ultimate result is not different from the result which we reached in our own decision, although the method by which the paramountcy of the lien of general taxes is reached in that case is worthy of consideration.

In this case, however, the rights of the State are involved which was not true in the case of the Bench Canal Drainage District case. And a section of our Statutes is to be considered in this case which had no bearing, or no special bearing, in the case just

mentioned. Reference is made to the provision of Section 115-2303, Rev. St. 1931, which was in effect at the time of the purchase of the bonds by the State herein and which provides that "taxes upon real estate are hereby made a perpetual lien thereon against all persons or corporations *except the United States and this state*." Counsel for the County has completely overlooked or ignored this provision, although attention to it was called by counsel for the Drainage District. What is the meaning of this provision? It is quite apparent that in any event the lien for general taxes cannot be held to be superior to the lien of the State which it has by reason of the bonds in this case. We may compare the exception clause in the foregoing statute with the exception clause contained in the Legislative Act of 1935 heretofore mentioned. We may note in that enactment that in Section 1 the holder of a tax sale certificate or of a tax deed is stated to have a lien superior to any other lien "except that of junior tax sales or subsequent taxes." It is apparent in this Section that the lien under the certificate or under a tax deed is "subject to" junior tax sales or subsequent taxes. In fact, Section 3 of the Legislative Act of 1935 provides that the Sheriff shall sell the land, "subject only to the rights of junior tax sales or taxes." We see no reason why we should give the exception clause under Section 115-2303 a different meaning. A like meaning was given to a similar clause in the case of McMillan v. City of Tacoma, 26 Wash. 358, 67 P. 68, 69, where it was said: "The Legislature expressly provided that the sale for street assessments should convey the entire title stripped of all prior liens or claims 'except unpaid installments and general taxes,' thereby unmistakably making the general tax lien superior to the street assessment lien."

If, accordingly, the Legislative Act of 1935 were construed as providing that the lien under a tax sale certificate or a tax deed is superior to the lien of the State under its bonds it would be violative of the law in effect at the time when the bonds were purchased by the State. We do not, however, believe that the Legislative Act should be construed as making any such provision. It does not purport to repeal Section 115-2303, supra. The term "person," as defined in the Act, does not profess to include the State. In State Land Board v. Campbell, 140 Or. 196, 13 P. 2d 346, it is stated that, "It is a universally accepted rule that words of a statute applying to private rights do not affect those of the state, and that the sovereign authority is not bound by the general language of a statute which tends to restrain or diminish the powers, rights, or interests of the sovereign, and when the rights of a commonwealth are to be transferred or affected, the intention must be plainly expressed or necessarily implied." In Trustees of Public Schools v. City of Trenton, 30 N. J. Eq. 667, 683, the court stated, "Where the government is not expressly, or by necessary implication, included, it ought to be clear, from the nature of the mischiefs to be reached, or the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorized to put a construction on a statute which would affect its rights." In Jones v. Tatham, 20 Pa. 398, the court stated: "Words of a statute applying to private rights do not affect those of the state * * *. The general business of the legislative power is to establish laws for individuals, not for the sovereign; and, when the rights of the commonwealth are to be transferred or affected, the intention must be plainly expressed or necessarily implied." To the same extent are U. S. Fidelity & Guaranty Co. v.

Bramwell, 108 Or. 261, 217 P. 332, 32 A.L.R. 829, 845, and cases therein cited; Trustees of Public Schools v. Taylor, 30 N. J. Eq. 618; People v. Doe, 36 Cal. 220.

IV. In determining the main question herein, we must consider other provisions. The school fund is made up in the main of proceeds from the sale of lands granted by the Government of the United States to this State in the Act of Admission. Section 5 of that Act provides, "That all lands herein granted for educational purposes shall be disposed of only at public sale, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools." Section 2 of Article VII of the Constitution provides that certain funds, including funds derived from the sale of lands granted to the State by Congress, are declared to be perpetual funds for school purposes, of which the annual income only can be appropriated. Section 1 of Article XVIII of the Constitution provides that: "The State of Wyoming hereby agrees to accept the grants of lands heretofore made, or that may be hereafter made by the United States to the state, for educational purposes, for public buildings and institutions and other objects, and donations of money with the conditions and limitations that may be imposed by the act or acts of congress, making such grants or donations." Section 6 of Article VII of the Constitution provides: "All funds belonging to the state for public school purposes, the interest and income of which only are to be used, shall be deemed trust funds in the care of the state, which shall keep them for the exclusive benefit of the public schools, and shall make good any losses that many in any manner occur, so that the same shall remain forever inviolate and undiminished. None of such funds shall ever be invested or loaned except on the bonds issued by school districts, or county

bonds of the state, or state securities of this state, or of the United States, or on first mortgages on farm lands or such other securities as may be authorized by law." Counsel for the County argues that the constitutional provisions of Oregon, Oklahoma and North Dakota, referred to in the cases hereinafter cited, are much stronger in guaranteeing the permanency and irreducibility of the school funds than the provisions of our own constitution. We fail to see it. It is hard to conceive of stronger language providing for the preservation of the school funds than that used in Section 6 of Article VII, when it states that they "shall remain forever inviolate and undiminished." And it is, of course, the bounden duty of this court to carry that provision, so far as in us lies, into force and effect, and we are unable to see that an excuse for not doing so would be furnished by the fact, mentioned by counsel for the County, that it is the duty of the legislature, under the same section of the constitution to make good any losses which are sustained by the school funds by reason of investments thereof. Further reference to this point will be made later.

The general rule is laid down in 56 C. J. 181 that, "The constitutions of the several states commonly provide, however, for the preservation and inviolability of the school fund, since the fund is intended to be a permanent one, and it is the policy of the state to preserve it; and any statute which infringes or conflicts with such a provision is, of course, invalid and uneffective." This rule is laid down under different states of fact. In State v. Peterson, 61 Idaho 50, 97 P. 2d 603, it is held that public school endowment funds are trust funds of the highest order. Some of the cases relate to the statute of limitations, holding that a general statute applicable to individuals

is not applicable when the school funds of the state are involved. In United States v. Fenton, 27 Fed. Supp. 816, the court stated as follows:

"There is a distinction between it (the general revenue) and the common school fund, as the State holds the revenue as its own property and can enact such legislation applying to it as to statute of limitation as it sees fit, while as has been said the State holds the Public School fund in trust under the conditions of a National Act and the Constitution of the State and not as its property. The Supreme Court of Oklahoma explains clearly this distinction in the case of Board of Commissioners of Woods County v. State ex rel. Com'rs., 125 Okl. 287, 257 P. 778, 779, 53 A.L.R. 1128, where it is said: 'There is a distinction between right accruing to the state in handling revenues belonging to it and the rights of the state arising from control of the common school fund, held in trust by the state. The revenues belonging to the state in its sovereign capacity are a part of its property, and so long as the state keeps within constitutional limitations it may deal with its property as it sees fit. On the other hand, the common school fund does not belong to the state, but the state merely holds such fund in trust under the conditions of the federal grant contained in the Enabling Act. The school funds were merely intrusted for the benefit of the common school, and the state pledged itself to hold such trust inviolate for the benefit of the schools. * * *' See In re Loan of School Fund, 18 Colo. 195, 32 P. 273.

"As both the Admission Act and the State Constitution grants in trust Public school lands, the proceeds from the sale thereof naturally remains as a part of the Trust, and that the conditions are inviolable conditions which were accepted by the State. The State cannot violate these conditions nor dissipate such funds by enacting limitation acts preventing recovery of the trust funds after a certain period, for it has not the power to accept such sacred and trust funds and after loaning it out, to, by its Act, bar its recovery, and duty to recover it back upon the non-payment of the loan."

In 61 C. J. 930, it is said: "Except where otherwise provided by constitutional or statutory provisions declaring the tax lien superior, a tax lien is not paramount to a prior mortgage held by the state, for example, a school-fund mortgage." And in 61 C. J. 1312, it is stated: "As an exception to the general rule above stated, and under appropriate statutes it is held that a tax sale purchaser does not acquire title free from the lien of a mortgage given to the state, or of one given to secure a loan of school funds, or of the state sinking fund." In the case of Helpfrey v. Ross, 19 Iowa 40, it is said that: "The faith of the State is pledged to preserve the school fund intact from loss in any quarter or from any cause." The statute in that State accordingly provides that land which is subject to a mortgage given to the school fund is not assessed except as to the equity of the owner over and above the school fund mortgage. In Indiana it is provided by statute that a tax deed conveys to the purchaser the title to the land subject to all the claims, liens and encumbrances of the State. In State v. Kilburn, 81 Conn. 9, 69 Atl. 1028, 129 Am.S.R. 205, it is held that the lien for a sewer assessment is inferior to a school fund mortgage prior in date and record. Among other things, the court said:

"School fund loans on mortgage can only be made on unencumbered lands worth double the amount loaned. * * * One holding such a mortgage stands in no need of further security. He would, however, be prejudiced should, after the acquisition of his mortgage title, any other and subsequent encumbrance be given priority. The law expressly provides that 'no tax assessed upon property mortgaged to the State of Connecticut to secure a loan from the school fund, shall be a lien upon said property which shall take precedence of such mortgage or mortgages thereon': * * * The preservation of that fund inviolate was specially guarded in the constitution (article 8, section 2)

which declares that it shall 'remain a perpetual fund, the interest of which shall be inviolably appropriated to the support and encouragement of the public, or common schools throughout the state, and for the equal benefit of all the people thereof,' and that 'no law shall ever be made, authorizing said fund to be diverted to any other use than the encouragement and support of public or common schools, among the several school societies, as justice and equity shall require.' If, in the face of these provisions, any statute could avail to subject an investment of the fund, once properly made, to risk of loss from a cause subsequently arising, it would require at least a clear and unmistakable expression of the legislative will."

The Oregon court in Eagle Point Irr. Dist. v. Cowden, infra, holds that the Connecticut statute above mentioned was merely declaratory of the purpose and intent of the fundamental law, and the same is held by the Supreme Court of North Dakota in State v. Divide County, infra. In the case of Trustees of Public Schools v. Taylor, 30 N. J. Eq. 618, it is held that moneys belonging to the State cannot be taxed by a municipal corporation, and, hence, the lien of mortgages given by a citizen for the support of public schools or to the chancellor in his official capacity cannot be subordinated to the lien of municipal taxes assessed on the mortgaged premises after such mortgages were given, notwithstanding the charter declares that such taxes shall be paramount to every other lien or encumbrance. The court, among other things, said:

"* * * To an appropriation of the securities of the school fund, either for general state purposes or for municipal purposes, there is a complete constitutional bar; the fund is expressly dedicated by the constitution to the support of free schools, and the legislature is prohibited by that instrument from borrowing, appropriating or using the fund for any other purpose, under any pretence whatever. Constitution, Article 4, § 7, Subdiv. C.

"It is contended on the part of the city, indeed, that this tax is not levied on state property; that the land only is assessed, and that the mortgage being mere personalty, and not an estate in land, is not assessed, and that the charter merely postpones the lien of the mortgage to the lien of the assessment. If it be admitted that the mortgage is mere personalty, still no legislative machinery can be construed whereby any security belonging to the school fund can be lawfully impaired. The lien of the mortgage is the constituent element of its value, and as much the property of the school fund as the mortgage itself, and the legislature has no power to waive or postpone such lien in favor of another, except upon full consideration paid."

And in the later case of Pugh v. Commissioners of Sinking Fund, 53 N. J. Law 629, it is stated, among other things, that:

"The charter of the city of Newark gives priority to taxes over all conveyances and encumbrances prior or subsequent, but it is the settled law of this state that provisions of that character in municipal charters do not apply to mortgages made to the state, or its representatives, to secure the funds of the state invesed on mortgage. The lien of such mortgages cannot be displaced by taxes subsequently imposed."

Also, to the same effect are The Trustees For The Support of Public Schools v. Shotwell, 45 N. J. Eq. 106, and Elizabeth v. The Chancellor, 51 N. J. Law 414. In Eagle Point Irr. Dist. v. Cowden, 137 Or. 121, 1 P. 2d 605, it was held that an irrigation district tax lien would not have priority over a mortgage securing payment of common school funds which was executed and recorded prior to the organization of the irrigation district. The court said in part:

"* * * With reference to property of the state, exemption from taxation is the general rule. Before such property may be subjected to taxation in any form, the Legislature must so declare, either by express enactment or by clear implication * * *.

"The state land board in loaning these (school) funds does so in the execution of a trust of the highest nature, which has been created by the fundamental law of this state. The fund itself is state property and, as stated in State Land Board v. Lee, 84 Or. 431, 165 P. 372, 375, '* * * the Constitution commands that the school funds derived from specified sources shall be irreducible, and that the interest shall be applied exclusively to the support of the common schools.'

"In view of this plain, mandatory constitutional provision, any act of the Legislature purporting, directly or indirectly, to divert the common school funds from the purpose to which they were thus dedicated would be unconstitutional. * * *

"We conclude that it was not the intention of the Legislature * * * to give priority to district assessment liens over mortgages securing the payment of common school funds, but that if the statute does purport so to do, it is in direct violation of article 8, § 2, of the Constitution of Oregon.

"The irrigation district has a strong equitable claim, by reason of having paid the county and state taxes levied on the property in question, but, in view of the constitutional bar, this court cannot consistently give priority thereto over the mortgage lien of the state land board."

The various cases decided by the Supreme Court of Oregon, involving the school funds, were reviewed in State Land Board v. Schroetlin, 161 Or. 146, 88 P. 2d 316, and the holding of the case of Eagle Point Irr. Dist. v. Cowden, supra, was reaffirmed. In the case of Board of Commissioners of Woods County v. State, 125 Okl. 287, 257 P. 778, 53 A.L.R. 1128, the Supreme Court of Oklahoma held that the lien for general taxes is on a parity with the lien of a loan from the school funds, but in the later case of State ex rel. v. Passmore, 189 Okl. 232, 115 P. 2d 120, that case was expressly overruled and the court held that a tax lien is inferior to the mortgage lien in favor of

the State. In the case of State v. Divide County, 68 N. D. 708, 283 N. W. 184, a lien of a school fund mortgage was held to be superior to the lien of general taxes. The holding apparently is based partially upon the statute and partly upon the constitutional provision that the school fund shall remain inviolate. The court apparently holds, contrary to what we have heretofore said, that a statutory provision which makes taxes a perpetual lien, except as to the State, does not itself fix the superiority of the tax lien and any other lien which the State may hold, but the court bases its decision partly upon a statute of North Dakota which provides that "other things being equal, different liens upon the same property have priority according to the time of their creation." This statute, however, but expresses a general rule enforced in the absence of a statute. Thus it is said in 61 C. J. 934, that:

"In the absence of constitutional or statutory provision making a tax lien paramount to all prior liens and encumbrances, under the view that such a provision is necessary to give the lien that effect, a tax lien is subject to the general rule that the first in time is first in right, taking its rank according to the time when it attaches."

And as to liens generally, see Section 37 C. J. 328, Sec. 40. The Supreme Court of North Dakota reaffirmed its holding in the late case of State v. Griggs County, 10 N. W. 2d 245, decided in June, 1943.

It is apparent, accordingly, that in states which have had occasion to pass upon a question similar to that involved in the case at bar, it has been held practically uniformly that the lien arising by reason of a loan from the school fund is a lien paramount to every other, and that as a matter of public policy the school fund mortgages should be fully protected.

We are unable to see how we can dissent from this array of authorities in view of our constitutional and statutory provisions. We do not think that the holdings of the Idaho Court in Kieldsen v. Barrett, 50 Idaho 466, 297 P. 405, is contrary to the authorities already cited. In that case it appears that the State, out of its general funds, created what was called a revolving fund out of which were paid taxes levied against lands, on which the State held school fund mortgages, and the statute further provided that upon the sale of the land under the school fund mortgage the taxes paid out of the revolving fund in no manner whatever prejudiced the school funds. Expressions are contained in the case which at first glance might seem to indicate that the lien of the mortgage and that for the general taxes are on a footing of equality, but these expressions in the main seem to be directed to the point that merely because the school fund may sustain a loss should not make any difference in permitting the advancements made out of the revolving fund to be returned thereto. We cannot say that we would hold differently from the Idaho case under the same state of facts. See also Toole County Irr. Dist. v. State, 104 Mont. 420, 67 P. 2d 989. We are not passing upon the question whether the Legislature may not enact a statute making the general taxes a superior lien to the lien of the state, especially if at the same time adequate provision is made for the protection of the school fund, and if no contracts are impaired. Since the constitution provides that the state shall make good all losses sustained by the school fund, the method of doing so would seem, to a large extent at least, to be in the discretion of the Legislature. At this time we merely pass upon the state of facts involved in this case, under constitutional and statutory provisions in force at this time and at

the time when the state purchased the bonds in question. The Legislature has not, so far, undertaken to make the lien of general taxes superior to the lien of the State here under consideration, as already shown.

The trial court, accordingly, was in error in holding the lien for general taxes superior to the lien of the State arising by reason of the bonds in question.

We shall not, in our conclusions herein, go further than necessary. The contention made herein by the Drainage District is that the lien of the State under its bonds is superior to the lien of the general taxes. With that contention we agree. We do so upon the theory that the State is not mentioned in the Legislative Act of 1935, as amended, nor does that Act contain any provision which, under the rule of law heretofore stated, includes the state by necessary implication. The paramount lien of the state above mentioned is, accordingly, unaffected by the statute of 1935 as amended and that superiority must be given effect in a foreclosure proceeding. It is not necessary herein to hold that the Legislative Act of 1935 as amended is wholly ineffectual so far as the state is concerned. No such contention is made herein. The policy of the State is, and should be, to place the land which for so many years has paid neither the general taxes nor the drainage taxes, again upon the tax roll. Ledegar v. Bockoven, 77 Okl. 58, 185 P. 1097, 1100. See Brewer v. Feigenbaum, 47 Cal. App. 2d. 171, 117 P. 2d 737; South San Joaquin Irr. Dist. v. Hornbeck, 2 Cal. 2d 485, 490, 42 P. 2d 64, 66. In fact it has been held that the economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. Keefe v. Drain Com'r., 306 Mich. 503, 11 N. W. 2d 220, and cases cited; 16 C.J.S. 702, note. Whether the

Legislative Act of 1935, as amended, should, under the proper facts, not in the record before us now, be held to be wholly inapplicable to the State need not now be decided, though it might be well for all interested parties to re-examine the statute in the light of all the various facts which might arise, and take such steps as may be deemed proper or necessary, if any. We need go no further in this case than to hold that under the fact, or lack of facts, as disclosed in the record, and under the constitutional and statutory provisions applicable, the State's lien heretofore mentioned is paramount to the lien of plaintiff, and the judgment of the trial court should be modified accordingly. It is so ordered.

*Judgment Modified.*

KIMBALL, C. J., AND RINER, J., concur